### FREEDMAN et al. v. DAVOPLANE BED CO.

(Circuit Court of Appeals, Seventh Circuit.   April 18, 1916.)

No. 2305.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—SOFA BED.

The Holmes, Bostrom & Bostrom patent, No. 848,305, is for a sofa-bed, the main element of which is such an arrangement of the parts when closed as to form a receptacle for the bedding in its made-up form. While showing only a slight advance, the combination also embodies other improvements on prior structures which, reinforced by the presumption arising from the grant and a marked commercial success, is sufficient to disclose patentable invention.   Claims 2 and 4 also *held* infringed.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Davoplane Bed Company against Hyman Freedman and Nathan Freedman. Decree for complainant, and defendants appeal. Affirmed.

Appellants prosecute this appeal from the decree of the District Court finding claims 2 and 4 of patent No. 848,305, granted to Holmes, Bostrom & Bostrom on March 26, 1907, for sofa-bed, to be valid and infringed by the two forms of appellants' sofa-beds, shown as "Plaintiff's Exhibits. Defendants' beds 1 and 2."

Claim 2 reads as follows, viz.: "In a sofa-bed, a pivoted and overturning seat, and a bed-bottom in three sections hinged to each other, adapted to be folded to form a clothes-receptacle under the seat and to be unfolded to form an expanded bed-bottom in a plane above the seat."

Claim 4 reads as follows, viz.: "In a sofa-bed, a pivoted and revolubly-overturning seat, a bed-bottom in three longitudinal sections, the two marginal sections being comparatively wide and the medial section being comparatively narrow, means supporting the medial section pivotally whereby it can be swung to horizontal position and in the same plane with the marginal sections and also can be swung to vertical position and the two marginal sections to opposite and parallel positions at a distance apart substantially equal to the width of the medial section."

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Drawings 2, 4, and 5 of the patent are here reproduced.

"The invention," say the patentees, "is directed chiefly to the novel structure of the auxiliary bed-bottom and to the means related thereto whereby it is snugly packed away in the sofa when not in use and can be easily and quickly converted into a usable bed-bottom, including the means for properly supporting and securing the bed-bottom in position. * * *

"In the drawings there is shown a sofa frame or body consisting of a back A and the arms or ends of the sofa B B. These parts are of any suitable size and form to make up a sofa frame or body like or similar to those in common use, the arms or ends being rigid to the back, making a strong and durable frame or body of the sofa-bed.

"The sofa-seat C is also of a form in common use and consists of a rectangular frame having thereon an upholstered or other cover forming the seat proper of the part. This rectangular or box-like seat in this sofabed is mounted on the frame pivotally, so that it is adapted to be turned over upside down, the pivotal support of the seat being at its respective ends and medially of its width. * * *

"In connection with the sofa-seat C there is a bed-bottom, composed in a general way of side and end rails and a spring-wire mattress, which bedbottom is in three sections or members —an inner section 15, an intermediate

or medial section 16, and an outer section 17. The transverse end rails of these inner and outer sections are hinged to the end rails of the medial section in the manner shown best in Figs 2, 4, and 7, the rails being of angle-bar and the vertical flanges of the rails of the sections 15 and 17 being made to overlap the vertical flange of the rails of the sections 16 and being hinged thereto by pivot-pins 18. The horizontal flanges of these thus-hinged rails are cut away near the ends of the rails to permit of the overlapping and fitting close together of the flat sides of the vertical flanges at and adjacent to the pivot, and the vertical flanges of the rails of sections 15, 17, and 19 severally project rearwardly underneath and fit upwardly against the horizontal flange of the rails of the thereto-hinged section when the sections are unfolded and extended in the same horizontal plane in the manner shown in Fig. 4. This construction strengthens the structure and assists in preventing the sections 15 and 17 from tilting downwardly out of the plane of the section 16 when the bed-bottom is extended. The section 16 is pivoted at each end on legs 20, secured rigidly to the frame of the seat C in such manner that the section 16 can be swung to the horizontal position with reference to the legs 20 when in an upright position, as shown in Fig. 4, or can be swung to a vertical position in the manner shown in Fig. 2 when the bed-bottom is folded up with reference to the sofaseat C. * * *

"The bed-bottom may be provided with a flexible wire mattress of any character adapted to serve as a mattress and at the same time to permit of the folding up of the sections. * * *

"It will be observed that when the structure is folded up and in the condition for use as a sofa, as shown in Figs. 1 and 2, that the inner section 15 of the bed-bottom is held close to and practically against the under side of the frame of the sofa-seat and that the outer section 17 of the bed-bottom is located at

a distance below the section *15*, thus providing a space or receptacle *D* between these sections, which is utilized for holding bedclothes. The bed is made up on the bottom, and is folded up in this space at the time of folding up the bed-bottom and before the sofa-seat, with the bed-bottom thereon and the bed therein, are turned over from the position of the seat as shown in Fig. 4 to the position shown in Fig. 2. Of course by the reverse operation the bed is opened out for use on the extended bed-bottom.

"It will be understood that because of the construction of the bed-bottom, consisting of the leaf-like sections *15* and *17*, hinged to the intermediate sections *16*, which is pivoted medially on standards, and because of the arrangement of the folding legs *21* the two leaf-like sections *15* and *17* of the bed-bottom are held apart when the bed-bottom is folded up, thus forming the receptacle for the bed. It will also be noted that in unfolding the bed-bottom the swinging of the sections *17* and *15* into horizontal positions as illustrated in Figs. 7 and 4 the section *15* will be elevated from its position as shown in Fig. 2 by reason of the interlocking end of the rails of the sections at the locality of their hinges, as shown in Fig. 7 in connection with the elevating effect of the folding legs *21*, caused by their being swung upwardly and rearwardly by the unfolding of the sections to the position shown in Fig. 4."

The specification proceeds to describe a modified form of construction, which we deem it unnecessary for our purposes to consider at this time. In this device a non-rotating sofa-seat is employed.

Appellants' alleged infringing devices 1 and 2 are both of the so-called rotary seat and bed type. Appellants concede that, if the claims of the patent are valid, their form No. 1 infringes. They deny that form No. 2 infringes. The record contains drawings of this device, of which those numbered 2, 4, and 5, to correspond with Figs. 2, 4, and 5 of the drawings of the patent, are herewith reproduced.

FIG. 4

FIG. 5.

Both the patented and the alleged infringing forms contain a sofa bed-frame *A B*, having rotatably mounted thereon the seat *C*. The seat on its under side carries a folding sectional bed-bottom constructed to retain the bedding in a made-up form, both when the bed is made up and when the sofa is in position. The seat is provided with a standard *20*, which serves, in each case, as a partial support for the folding bed-bottom, and with a link *21*, the lower end of which is pivoted to the seat frame while the upper end is pivoted to the rear part of the bed-bottom.

The beds are alike as to the relative size, shape, and arrangement of the several sections. Each has a jointed border frame in combination with a continuous flexible wire mattress carried thereby, which is stretched across the space bounded by the frame, and forms the bed-bottom. In each case,

FIG. 2

the inner section comprises the inner side rail *15a* and those parts of the two end rails *15* extending from said side rail to the nearest section joint pivots, in combination with that part of the wire mattress which is attached to and lies between said side rail and said parts of the end rails *15*. In like manner, the outer section in each case comprises the outer rail *17a* and those parts of the two end rails *17* extending from said side rail to the nearest section joint pivots in combination with that part of the wire mattress which is attached to and is disposed between said outer side rail *17a* and said parts of the end rails *17*. The middle section in all the forms in question comprises the middle or connecting rails *16* in combination with that part of the wire mattress which is disposed between said middle rails, and is connected to the jointed border frame at points substantially opposite the joint pivots in such manner as to cause the middle part of the mattress to lie at all times between and substantially parallel with said connecting rails *16*, and to operate substantially as though attached thereto, though, in fact, actually connected to the inner portion of the adjacent end rails *15* and *17*. With respect to the features here involved, appellants' devices differ from the patent, in so far as the sectional character of the bed-bottom is concerned, only in that the spring fabric is not directly attached to end rail *16*, but instead has the wires and spring members at each end of its middle part extending diagonally and attached directly to end rails *15* and *17* at the ends of rails *16*, leaving the rails *16* free from the wire mattress fastenings, but carrying the support thereof to a point slightly removed from said rails *16*, and there uniting with a section of the wire mattress which spans a space in the mattress corresponding exactly to the medial section *16* of the patent, and constituting, through means not here in question, the upright section of the book-cover like receptacle which serves to space apart the so-called wing sections *15* and *17* of the bed-bottom when adjusted to form a compartment in which the bedding will be contained when the device is in use as a sofa.

It will be observed that the claims nowhere call for the attachment of the wire or spring fabric of the medial section directly to the end rails of that section. This latter feature constitutes the only difference between the patent in suit and appellants' sofa-bed, Exhibit 1. In both of appellant's structures, the spring fabric is flexed in the same lines to form the same bedding receptacle. When the structure is in the sofa position, the wire or other spring fabric forms the top, bottom, and back of that receptacle, while the apron *28* forms the fourth wall. Both appellee's and appellants' devices are provided with this apron *28* in the form of a wooden panel which extends down from the front of the sofa-seat when in sofa position. This gives a finished look to the

sofa front and removes all appearance of the device being anything else than a sofa. In the prior art the sofas either show a hinge in front, or a break in the face of the structure, or are of two sections, or otherwise vary from the patent in suit.

The term "bed-bottom" of the patent includes the end and side rails of the three bed sections and the mattress. That of the patent and those of the alleged infringing devices are practically identical in form so far as here involved, both when extended and when folded under the sofa-seat. The flexing lines indicate the three sections in each, when folded. These are the lines upon which the bed-bottom is folded and unfolded. The term "in a plane above the seat" refers to the fact that when the sofa-seat is rotated it passes beneath the bed portion, which is thereby rotated to the top or sofa-seat proper position. The alleged fact that by measurement the bed-bottom is found in Figs. 2 and 4 of the drawings to be slightly higher from the floor than the normally positioned sofa-seat is not deemed proof of a different significance. By the arrangement of the patent, space for spring action of the bed-bottom is attained, as well as space for bedding. It is appellants' contention that they have only a two-section bed-bottom. The claims were allowed in the Patent Office without amendment.

In support of the defense of invalidity in view of the prior art, appellants have introduced a number of prior patents, of which, however, we need mention only patent No. 29,832, granted to Tendler and Moeshlin, for a sofa bedstead, on August 28, 1860, patent No. 248,959, granted to O. Stechhan for a bed lounge on November 1, 1881, patent No. 453,474, granted to Hallquist and Wennberg for a sofa-bed on June 2, 1890, patent No. 497,191, granted to R. Lundberg for a sofa-bed on May 9, 1893, patent No. 617,754, granted to A. Martenson for a bed-sofa on January 17, 1899, patent No. 749,307, granted to H. A. Linderoth for a bed-chair or bed-sofa January 12, 1904, patent No. 779,819, granted to W. Thompson for a divan folding bed on January 10, 1905, and patent No. 368,472, granted to F. W. Heringhausen for a sofa-bed August 16, 1887.

"What the patentees in suit did in one exemplification of their so-called invention," says the appellants' counsel, "was to take the old bodily-revoluble or overturning sofa-seat (Hallquist, Lundberg, Martenson, Linderoth) and substitute for the particular form of sectional bed therein disclosed a specific form of old three-section bed (Thompson, Tendler, Stechhan). Or, to state it differently, they took an old form of three-section bed (Thompson) constructed, so far as the bed-frame and wire mattress were concerned, exactly like that of the patent in suit, and hitched it onto an old revoluble sofa-seat in the place of the folding bed thereon. The specific way in which the hitching was accomplished, that is, by pivoting the medial section or hinge or link medially to the supporting post, was novel, but, we urge, not patentably novel."

These prior patents and other evidence will be dealt with in the opinion.

The findings of validity and infringement by the District Court are relied on as error.

· Walter H. Chamberlin, of Chicago, Ill., for appellants.

· William R. Rummler, Cyrus W. Rice, and Fred M. Davis, all of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and ALSCHULER, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). The main element of the combination patent in suit is that which makes provision for a bedding receptacle—the three-section bed-bottom. By means of it, the bedding can be stored in a made-up form, so that, when the sofa-seat is overturned and the bed-bottom extended, the bed will be ready for occupancy. Other features are achieved, such as those which deceive the eye by the almost perfect representation of a device which is a sofa and nothing more. Other advantages are

found in the ease with which the device may be manipulated, whereby it can be operated by a woman; the fact that it need not be pulled away from the wall when rotated to bed form; the resilient character and mounting of the spring feature; the cheapness of manufacture and simpleness of construction. All these desirable ends are found within the patent. Its success as an article of commerce was and is marked. The combination of all these and others in one symmetrical and attractive whole, other things being equal, furnishes patentable novelty. It is, however, a matter of common knowledge that this field of invention has been prolifically exploited. The record presents a number of prior patents covering sofa beds, as above noted.

The Tendler and Moeshlin sofa bed-bottom contains but two sections. It does not appear to have been on the market. The sofa-seat is hinged to the front face of the sofa-bed frame and, when the device is to be changed to a bed-form, is swung forward on the hinges, thus exposing the bed. It is not of the rotary form of sofa-beds. Its two bed-bottom frame sections are connected by a link or bar placed flatwise against the end, and so as to lap an equal distance on each frame. "The distance between the centers of both of the pins $c, c,$ of each of the bars $C, C,$" says the specification, "should be somewhat greater than double the thickness of the mattress in order that such mattress may be bent in its middle and one-half of it be turned over upon the other half during the process of turning the front half of the bed foundation toward and over the rear half thereof."

It is evident that if the connecting links are extended to space the so-called foundation parts sufficiently to receive the doubled-up mattress and other bedding, there will be presented a chamber or receptacle having only a top and bottom and having no back wall. Moreover, this device does not utilize the clearance space between the bed-bottom and the sofa-seat for spring action of the bed-bottom. These facts, together with the failure to disclose a merchantable article, seem fairly to disqualify this patent as an anticipation. Its slatted bed foundation or mattress does not permit of expansion. The hinges on the front would clearly indicate the double character of the sofa-bed.

Stechhan also provided a bed-bottom with but two sections. It has no medial section. "The invention," says the specification, "principally consists in the application of a peculiar form of double hinge to the lounge." The device presents no adequate bed clothing receptacle. It resembles the Tendler and Moeshlin structure. It is not of a rotary character. Even when extended, the bed-bottom parts are separated by an appreciable space which must make itself felt even when covered by a mattress, It comes far short of the combination of the patent.

The Hallquist and Wennberg patent was cited by the Patent Office during the prosecution of the patent, against claim 1. The device is of the rotary type. No provision is therein made for retaining the bedding, though space is not wanting if properly inclosed. The structure of the patent does not seem to have been deemed in the Patent Office as suggestive of claim 2 in suit. The patent shows a bodily revoluble and overturning sofa-seat with a three-section bed-bottom in which the

medial section is wide and the wing sections may be folded onto the medial section, but not in such a manner as to produce a receptacle for the bedding. The device lacks any suggestion of the concept of the patent in suit. The wing sections serve and can serve no such purpose as those in suit. There is no receptacle. While these wing members carry a woven wire mattress and stretch it for use as a bed, they are not intended to, and do not, serve to form any room or receptacle. In the patent sofa-bed it is the medial section that does this, and no amount of adjustment could effect that end in Hallquist's device.

The Lundberg patent calls for a sofa-bed of the rotary kind. It is not pertinent as a reference here. Its folding head and front boards do not justify its citation as against the wing sections of the patent in suit.

The Martenson bed-sofa calls for a construction whereby, when folded or closed to serve as a sofa, the clothing of the bed is contained therein, and all parts so adjusted and secured as to make the article look like a sofa. The seat is rotatable. When rotated there is disclosed a bed folded in two sections which are hinged together, the one folding over upon the other. The edges of the rails of the two sections "stand higher than the surface of the mattress so as to form a space between the frames [edges] when folded for the retention of the bed clothes," etc. This is not apparent from the drawings. Space for storing the bedding is not shown. Certainly if any there be, it must be very inadequate and not suitable for compassing the bedding in a made-up form. To provide such a space must inevitably interfere with the closing of the sections, and consequently the operation of the sofa. The hinge or folding line cannot fail to present what is known as a hard-center, by reason of the cross-piece of the frames. Each section has its own bed spring and bed-bottom. It comes far short of an anticipation of the patent in suit.

Linderoth shows a bed chair or sofa of the rotary construction. The combined sofa or chair and bed is rotated upside down, presenting the bed portion in folded form. The upper frame is turned on its hinges to a plane with the lower section. This is further extended by drawing out a third section having slidable support in the second section. The device makes no provision for bedding space, and in no way anticipates the patent in suit.

Thompson's particular object was to produce such a bed suitable for a divan. It is not rotatable. While it makes provision for storing a mattress and other bedding, it lacks almost entirely the concept of the patent. It would require a degree of adjustment amounting to invention to change it into the sofa-bed of the patent. The bed-bottom is not in a plane spaced above the seat. The operation of the device involves the shifting of bearings and pivots. Its parts could not be combined with Tendler or any other of the prior art devices to produce that of the patent in suit without adjustments made in the light of the patent, which, but for the patent in suit, would be patentably new.

Heringhausen's sofa-bed is of the non-rotatable type, and has no bearing upon the features here in suit, except that it may be unfolded

into bed form, though by means entirely foreign to those of the patent in suit. No provision is made for the storage of bedding. There is nothing in it to suggest the Holmes and Bostrom construction.

Thus we see that there is nothing in the prior art which, without serious modification, can be said to anticipate appellee's device as covered by either claim 2 or claim 4. As stated by its counsel:

"The patentees of the patent in suit were the first to place a resilient bed-bottom capable of flexing in three sections, in a new situation, in which it was spaced above a supporting substructure in such manner as (1) to utilize the space for clearance to permit proper spring action of the bed-bottom, and (2) also to utilize said space for collapsing one of the sections upon the substructure so as to permit part of the bedding to occupy part of the space before used for such clearance, and to suitably support and retain the bedding therein in a made-up form."

We are not impressed with the claim of appellants that the patent covers rather an aggregation than a combination. All the parts claimed are—

"associated in a unitary structure and there co-operate to produce either a new mode of operation or a new result, or the old result in a modified or improved way." Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, 138 C. C. A. 23.

The advance made by the patent upon the prior art is slight. Indeed, there seems to have been little room for marked advance. Perhaps there is no article designed for man's comfort in which slight advances are more appreciated. The elements entering into what constitutes a perfect sofa-bed are set out in the record by a dealer in supplies for sofa-beds of many years' standing. Among these are the following: That the sofa-seat should be of the usual height from the floor when in sofa form; that the sofa should not suggest adaptation to beds or other forms; that there should be a substantial spring fabric forming the main part of the bed-bottom with clearance below for spring action; that there should be cushion springs for the seat and a flat spring mattress for the bed-bottom, independent of each other; that the bed spring should be continuous and free from contact with under rigid braces; that the sofa-bed be capable of containing the bedding at all times in made-up form; that the device should be easily operated by women; that the operating parts be simple and not liable to get out of order; that the bed be operable without moving it away from the wall; that it be inexpensive and easily handled for shipment and reassembling. All of these, the sofa-bed of the patent possesses. The most marked novel element is the three-section bed-bottom, whereby provision is made for storing the made-up bed. Another feature is the simplicity, whereby ease of operation and cheapness are attained, as above set out.

Two forms of sofa-bed are covered by both the claims in suit, viz., that wherein the standards upon which the bed frames are pivoted are mounted upon the stationary frame, and that in which said standards rest wholly upon and are carried by the sofa-seat. Claim 2 is broad enough to include sofa-seats hinged at the front of the sofa frame. Claim 4 specifically calls for a medial section which is wider than the wing sections and limits the device to a revolubly overturning seat.

As above stated, appellants admit that if the patent in suit is valid, their form No. 1 infringes. Appellants' expert testified that claim 2 reads on both forms 1 and 2 of appellants' device—

"unless the court finds the language used in the claim to the effect that the bed-bottom when unfolded forms an expanded bed-bottom in a plane above the seat, to mean such a form of structure as is illustrated in Fig. 4 of the patent in suit in which this bed-bottom plane is actually above a horizontal plane which would pass through the top of the upholstered surface of the sofa-seat when in its assembled form as a sofa."

As we have above stated, that language of claim 2 applies to the sofa-seat when overturned. Appellants' attempt to avoid the patent by alteration of some detail of the frame construction claimed to be taken from Tendler fails entirely to escape the concept of the patent in suit or of either of the claims in suit. In the form 2 of appellants' device the end rails of the medial sections are not directly supported by the uprights *20*, the end rails *17* being extended beyond the point of their pivoted attachment to the medial section end rails, and the extended parts of said end rails *17* being pivoted to said uprights *20*. While in appellants' device 2 the ends of the rails *17* and *15*, when in bed position, are spaced apart only slightly, yet when the sections are folded in preparation for the sofa position, they are very considerably spaced apart. In the first form they may resemble Tendler, but in the latter the variance is emphatic—practically the equivalent of the medial section of the patent in suit as to spacing. Moreover, the mattress of the bed-bottom flexes just as does that of the patent and on the same lines. We concur in appellee's statement that the bed-bottom "sections are divided from each other by the lines on which they are folded and unfolded." The appellants' sofa bed-bottom No. 2 is therefore the full equivalent of appellee's three-section bed-bottom.

The utility of the device, appellants' appropriation thereof concedes. While not decisive of the question of invention, the commercial success of the patented sofa-bed adds probability to its patentable character. None of the alleged prior art devices have survived, if, indeed, any of them ever went into commerce. Both the sofa-bed of the patent and that of the appellants have found considerable favor in the market.

The foregoing, re-enforced by the presumptions growing out of the grant of the patent, lead us to the conclusion that the patent is valid, and that both of the claims in suit are infringed by each of appellants' sofa-bed forms.

The decree of the District Court is therefore affirmed.