E. W. Smiley v. Commissioner.
Smiley v. Commissioner
Docket No. 1506.
United States Tax Court
1944 Tax Ct. Memo LEXIS 95; 3 T.C.M. (CCH) 1040; T.C.M. (RIA) 44320; October 5, 1944
*95 Hugh W. Allin, Esq., 1008 Lafayette Bldg., Detroit, Mich., for the petitioner. Paul A. Sebastian, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding seeks a redetermination of deficiencies in the sums of $513.39 and $2,591.20 for the years 1940 and 1941, respectively. The question presented is whether petitioner is to be allowed a deduction for payments made to his son during the years in question as ordinary and necessary expenses under Internal Revenue Code, section 23. Findings of Fact Petitioner is an individual residing at Sturgis, Michigan. His income tax returns for the periods in question were filed with the collector for the district of Michigan. During the year 1930 petitioner entered into a contract with Berridge Shear Company, a manufacturer of cutlery and tinner's tools, under the terms of which he was to receive $200 a month, plus a bonus equal to 30 percent of the annual income of the corporation in excess of $7,500. He was employed originally as secretary and general manager of the corporation and continued in this capacity until 1937 when he was made treasurer of the corporation. He served in these three capacities *96 throughout the years here in issue and until he severed his connection with the corporation on February 11, 1944. In August, 1939, he owned 1,062 shares of Berridge Shear Company stock which had been purchased at various times, out of a total outstanding capital stock of the corporation of 7,500 shares. His duties as general manager of the corporation consisted of the general supervision of the plant, including supervision of sales and of the office, purchasing and making sales himself. A. E. Algrim was plant superintendent of the Berridge Shear Company. His duties consisted of being in charge of the actual manufacturing operations of the corporation. He had a contract with the corporation similar to that held by the petitioner which provided for a salary of $200 a month, plus a bonus of 20 percent of the net income of the corporation in excess of $7,500. Algrim severed his connection with the corporation during the year 1942. The Berridge Shear Company kept its books of account on a fiscal year basis ended June 30 of each year. During the fiscal years 1935 to 1941, inclusive, petitioner received the following bonuses from the corporation: 1935
$ 1,200.00
1936
4,500.00
1937
6,900.00
1938
5,760.00
1939
8,310.33
1940
12,824.54
1941
19,182.38
*97 The sales of the Berridge Shear Company during the years 1939, 1940, 1941, and 1942 amounted to $184,200.80, $222,734.30, $290,634.87 and $353,315.38, respectively. The trend of the business in which the Berridge Shear Company was engaged continued upward throughout the years here in issue. The Berridge Shear Company had some of the same customers during the years 1939, 1940 and 1941 that it had in years prior thereto. During the years 1939, 1940 and 1941, the Berridge Shear Company had obtained orders from several mail order houses, including Sears, Roebuck & Co., the latter being its largest customer during the years involved, purchasing approximately 40 percent of its production. Mail order houses customarily placed their orders on the basis of their catalogs. Sears, Roebuck & Co. issue a catalog twice a year. Mail order business is highly competitive and it was advisable to keep in close contact with the purchasing agents throughout the year. The business with the mail order houses represented more than 50 percent of the corporation's total business. The Berridge Shear Company did not have substantial war contracts during the fiscal year ended June 30, 1940. The war contracts *98 increased somewhat in 1941. Eventually 70 percent of the business was directly or indirectly on the basis of war contracts. The Berridge Shear Company did not employ salesmen as such at any time but had factory representatives in various parts of the country who represented other manufacturing concerns as well as the Berridge Shear Company. In 1940 the corporation had one factory representative on the Pacific coast and one factory representative in New York City. Prior to 1940 the corporation had six to eight such representatives throughout the country. After July 1, 1941, Lend-Lease priorities went into effect causing a boom in business and creating little need for sales travel thereafter. Under date of August 1, 1939, E. W. Smiley, Jr., petitioner's son, was employed by the Berridge Shear Company. His compensation from the corporation during the year 1939 was $20 a week for the first three months, $22.50 for the next three months and $25 a week for the balance of the year. Thereafter his salary was raised to $125 a month which he received in 1940. In 1941 he received $150 a month. The son was 23 years of age at the time he was employed by the corporation. He was a high school *99 graduate and attended business college for two years. Prior to this time he had worked several summers in the Berridge Shear Company plant. After graduation he worked for the United City Gas Co. in Chicago where he did clerical work and later handled banking matters connected with the subsidiaries of that company. Still later the company sent him to Oconto, Wisconsin, to learn more of the gas business. In February, 1938, he was made local manager of the Tennessee Gas Company, being in charge of the sales operation and policies of three branches. At the time he gave up this position to go with the Berridge Shear Company on August 1, 1939, his salary was $200 a month and bonuses which amounted to between $25 and $50 a month. When petitioner's son left his employment with the Tennessee Gas Company and came to work for the Berridge Shear Company, he and petitioner agreed that petitioner would pay him out of his bonus an amount equal to all between $7,500 and $8,000 per year and one-half of any excess over $8,000. Pursuant to this agreement petitioner paid his son $2,605.34 during the year 1940 and $6,076.19 during the year 1941. The agreement between petitioner and his son was modified *100 as of July 1, 1942, it then being provided that the son should receive an amount certain of $1,200 per year. Petitioner and his son anticipated that their combined efforts would result in financial advantage to both of them. Petitioner's son was not originally employed to fill any vacancy in any existing position. When petitioner's son first was employed by the Berridge Shear Company he assisted as purchasing agent and with sales. He took care of and brought up to date the sales records in the office. He also did follow-up work on sales and orders, prepared and checked daily billing and bill extensions. When petitioner traveled, his son kept complete track of the sales and output during the time petitioner was away. After the son had been with the corporation for about a year he took over the supervision of the Sears, Roebuck account. Prior to that time he had made calls on Sears, Roebuck, whose account was the largest the company had. The son solicited and secured new accounts for the corporation. He also assisted Algrim in the factory. The son used approximately 15 percent of his time during 1939 in connection with buying and selling and approximately 60 percent in connection with *101 such things as billing and following up sales. Petitioner's son was considered a full-time employee of the Berridge Shear Company by petitioner and the corporation. All of his duties during his employment by the corporation were in the name of Berridge Shear Company. During the time he was employed by Berridge Shear Company petitioner's son assisted petitioner with personal matters outside of office hours. The officers of the Berridge Shear Company were advised of the agreement between petitioner and his son relative to the payment by petitioner of part of his bonus to petitioner's son. They registered no objection to the arrangement. Petitioner, during the period in question, made business trips for the Berridge Shear Company on an average of twice a month and for two or three days' duration. Petitioner's son also did some traveling on behalf of the corporation. The traveling expenses of both petitioner and his son were paid by the corporation. Algrim severed his connection with the Berridge Shear Company during the year 1942 and at that time petitioner's son was appointed to his position of plant superintendent at the same salary ( $200 per month) paid Algrim. This was regarded *102 as a better position than the one formerly held by petitioner's son. He remained in this position until he left the employ of the corporation on August 11, 1943. The work as plant superintendent was not as difficult as it had been when performed by Algrim. During the years 1939 to 1942 petitioner's son was not underpaid by the corporation. In his income tax returns for the calendar years 1940 and 1941 petitioner claims a deduction of $2,605.34 and $6,076.19, respectively, as payment to his son for services rendered in connection with the earnings of petitioner's bonus. The amounts paid by petitioner to his son did not constitute ordinary and necessary expenses of petitioner. Opinion There being no contention that petitioner assigned his earnings to his son in such a way as to transfer the initial tax burden from the former to the latter, cf. Lucas v. Earl, 281 U.S. 111, 74 L. Ed. 731, 50 S. Ct. 241, the controversy is limited to petitioner's claim that the payments constitute an allowable deduction from what was admittedly his gross income, on the theory that they were ordinary and necessary expenses. Since the son was admittedly employed by and engaged in discharging the *103 business of the corporation of which petitioner was general manager, and since compensation was paid to and accepted by the son from the corporation on the basis that he was devoting his full time and energy to the corporation's affairs, there is grave doubt whether these payments can be regarded as in any sense expenses of the petitioner. Hal E. Roach, 20 B.T.A. 919. But an even more serious obstacle to the allowance of the deduction arises from our view that petitioner has completely failed to demonstrate the necessity of the supplemental payments. To explain the arrangement between petitioner and his son one of two premises must be assumed, the choice being unspecified by petitioner's contentions as we understand them. It could be urged that the amount of salary paid to the son by the corporation was adequate to compensate for the services rendered, but that for reasons of his own petitioner undertook to supplement his son's income. In this event, of course, the payments would be neither ordinary nor necessary, but rather in the nature of gifts for which the statute grants no deduction. W. M. Ritter Lumber Co., 30 B.T.A. 231, 272. *104 And the same would be true if it were contended, as petitioner's position somewhat suggests, that notwithstanding the adequacy of the compensation for the work to be performed, the son would not have undertaken it without petitioner's supplemental remuneration. For all that would mean would be that an adequate employee could have been obtained without the expenditures on petitioner's part, but that for personal reasons he preferred his son's assistance. The necessity of the payments from a business standpoint would then be equally unimpressive. Security First National Bank of Los Angeles, Exec., 28 B.T.A. 289, 319. On the other hand, the premise could be assumed that the compensation awarded by the corporation was inadequate for the services contributed, and that this would be true whether the son or a stranger were employed to do the work. One difficulty with this assumption is that it requires us to find that a solvent and profitable corporation was unwilling to pay for necessary services what they were worth on the market place. There is no evidence whatever to support this contention, no showing either of what others would have been willing to *105 accept for work comparable to that performed by the son, nor of what other employers similarly situated were prepared to pay for comparable services. But even if we assume, in the face of this, that the salary compared inadequately with the services performed, we are wholly unprepared to conclude that this situation was either ordinary or necessary and as a consequence that any expenditures incurred by petitioner to correct it were ordinary and necessary expenses. It seems clear that petitioner, being the general manager of the corporation, and having satisfied himself that the work involved would contribute to the prosperity of his employer would have been entirely justified in having the corporation pay whatever the work was worth. The sole suggested impediment in the pursuit of this course of action is that petitioner was reluctant to apply an appropriate wage scale in the particular instance under discussion because of the relationship between him and the prospective employee, his son But all that follows from this is that had petitioner elected to employ a stranger, he could have prescribed, and the corporation would have approved, a compensation adequate to the services contributed *106 and, as a result, there would have been no necessity and no occasion for the payments out of his own pocket. Kenan v. Bowers (C.C.A., 2nd Cir.), 50 F.2d 112. Here again, we are confronted with the proposition that only petitioner's election to employ his own son for reasons satisfactory to himself furnishes the occasion for the payments in dispute. This is far from sufficient to characterize the expense as ordinary and necessary. See Walter E. Kramer, 27 B.T.A. 1043, 1050, appeal dismissed (C.C.A., 7th Cir.), 80 F.2d 1014. We think the conclusion must be that on no interpretation of the facts has it been demonstrated that the payments in question were necessary expenses of this petitioner and hence that they must be disallowed as unauthorized by the revenue law. James D. Robinson, 45 B.T.A. 39. Decision will be entered for respondent.