Appeal of **DIXIE MANUFACTURING CO.**                Docket No. 475.

> A theoretical inventory computed by an examining agent *held,* under the facts in the case, not to be properly used by the Commissioner in the adjustment of net income.
> Income and invested capital otherwise adjusted in accordance with findings of fact.

Submitted January 29, 1925; decided February 28, 1925.

*Frank Reagan, Esq.,* for the taxpayer.

*A. Calder Mackay,* and *Charles H. Curl, Esqs.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal, heard on January 15, 1925, is from a notice sent by the Commissioner to the taxpayer under date of September 3, 1924, of a deficiency in income and profits taxes for the years 1917 to 1920, inclusive, in a total sum of $10,762.65, made up as follows:

| | |
|---|---|
| 1917 | $218.07 |
| 1918 | 5,170.58 |
| 1919 | 1,292.95 |
| 1920 | 4,081.05 |

FINDINGS OF FACT.

The taxpayer is a Georgia corporation organized under date of August 15, 1912, with an authorized capital stock of $500,000.

61359°—26——41

Capital stock was issued in exchange for the assets of a preexisting partnership of the same name. Said assets included an interest in certain patents and certain bills receivable, the declared value of which is not shown by the record.

On December 31, 1916, there was outstanding capital stock of the corporation in the sum of $62,600, of which accounts or bills receivable above mentioned constitute the sum of $5,922.90, and good will and prospects appeared on the books at a value of $50,720. The account of good will and prospects, $50,720, was entered on the books on or about February 3, 1916.

The preexisting partnership had expended certain sums on the development of the patents transferred to the corporation, but no evidence as to the value of such patents at the date transferred is contained in the record.

The taxpayer, during the years in question, was engaged almost exclusively in selling razors by mail order. Under its plan of operation razors were sent on ten days' free trial to persons answering advertisements in newspapers and otherwise, without inquiry as to their financial standing. At the conclusion of such trial the persons were expected, under the free trial offer, either to return the razors or to remit the price. The razors so offered for sale cost the taxpayer, during the period from 1917 to 1919, an amount varying from slightly more than 30 cents each to slightly less than 42 cents, and in 1920 a considerable number cost as much as 50 cents.

Razors were sold during the years 1917 to 1920 at a price ranging from about $1.60 to a little less than $2 on the average. Large numbers of razors so shipped to prospective purchasers were neither returned nor paid for.

The taxpayer kept its main books of account on a cash receipts and disbursements basis and made its returns for all the years in question on that basis. It took no inventory and kept no accounts receivable on its books.

When a razor was sent out on mail order, a card record was made of the shipment, and these records were transferred to appropriate files when the razors were returned or paid for.

For all years except 1919 and 1920, the taxpayer kept card records only of the razors paid for, and destroyed the card records covering razors not paid for and razors returned.

An examining revenue agent reporting under date of March 27, 1923, and submitting a supplemental report under date of September 18, 1923, made an exhaustive examination of the books and other records of the taxpayer, which examination, in its main aspects, formed the basis of the Commissioner's determination of a deficiency and its findings objected to by the taxpayer represent the issues on this appeal. The examining agent was present at the hearing and testified fully as to the nature and scope of his examination and the method used by him in determining the taxpayer's income for the years in question. With minor differences, he found that the taxpayer's report on a receipts and disbursements basis was substantially correct in that it reported substantially correct receipts and substantially correct disbursements. He believed that the taxpayer's business required the use of inventories and endeavored from the records available to establish an inventory basis on which to com-

pute the cost of goods sold by the taxpayer and the resulting net income.

The card records for each of the several years showing the actual shipments of razors were not available, and the examining agent made a computation from the card records designed to account satisfactorily for such of the razors purchased as were actually shipped out. This method, which was uniform for the years 1917 to 1919, inclusive, may be illustrated from the figures for 1917.

The actual total number of razors sold and paid for in the year 1917 was 25,833, for which the taxpayer received the sum of $42,132.63, an average price of $1.63. In 1919 the number of razors paid for was 71.241% of the total sent out. Dividing this percentage into the above number of razors paid for in 1917 gives a total number sold in 1917 of 36,283. At the 1917 price of $1.63 each, the total gross sales would be $59,141.29.

Of the razors sent out in 1920, approximately 10 per cent were returned, and this percentage was applied to the years 1917, 1918, and 1919 to arrive at the number on hand at the end of each of the several years. From the number so returned, it was determined by the examining revenue agent that approximately 25 per cent were not susceptible of further sale. Such number was deducted from the estimated number returned.

Upon the basis above set forth, the examining agent determined the inventory in quantity and value of the razors of the taxpayer for all of the years in question, except as to the opening inventory of January 1, 1917, which was put at $875, this being the amount of an inventory item contained in a statement rendered by the taxpayer to R. G. Dunn and Company as of December 31, 1916.

As so computed, the inventory for all the years in question as determined by the examining agent is as follows:

| | | | | | |
|---|---|---|---|---|---|
| Balance Jan. 1, 1917 | | | | | $875. 00 |
| Purchases, 1917 | | 43, 933 | | $14, 360. 89 | |
| Add razors returned | 3, 719 | | $1, 215. 66 | | |
| Less depreciation at 25 per cent | 930 | 2, 789 | 303. 99 | 911. 67 | |
| To be accounted for | | 46, 722 | | 15, 262. 66 | |
| Razors sold | | 36, 283 | (cost) | 11, 659. 13 | |
| | | | | | 3, 613. 43 |
| Increase, 1917 | | 10, 439 | | | |
| Balance Jan. 1, 1918 | | | | | 4, 488. 43 |
| Purchases, 1918 | | 79, 010 | | 26, 916. 28 | |
| Add razors returned | 5, 512 | | 1, 880. 90 | | |
| Less depreciation at 25 per cent | 1, 378 | 4, 134 | 470. 22 | 1, 410. 68 | |
| To be accounted for | | 83, 144 | | 28, 371. 96 | |
| Less razors sold | 55, 119 | | | | |
| Deduct inc., 1917 | 10, 439 | | (Cost) 3, 613. 43 | | |
| | | | 44, 680 "15, 800. 02 | 19, 413. 45 | |
| Balance, Jan. 1, 1919 | | 38, 464 | | | 8, 958. 51 |

| | | | | |
|---|---|---|---|---|
| Purchases, 1919 | | 81, 549 | | $32, 309. 90 |
| Goods returned | 7, 371 | | $2, 919. 87 | |
| Less depreciation at 25 per cent | 1, 859 | 5, 512 | 736. 41 | 2, 183. 46 |
| To be accounted for | | 87, 061 | | 34, 493. 36 |
| Less razors sold | 73, 706 | | | |
| Deduct inc., 1917–18 | 38, 464 | (Cost) 8, 958. 51 | | |
| | | 35, 242 "13, 647. 59 | | |
| Balance, Jan. 1, 1920 | | 51, 819 | | $11, 887. 26 |
| Purchases, 1920 | | 166, 197 | | 70, 804. 30 |
| Goods returned | 12, 037 | | 5, 127. 76 | |
| Less depreciation at 25 per cent | 3, 009 | 9, 028 | 1, 281. 83 | 3, 845. 93 |
| To be accounted for | | 175, 225 | | 74, 650. 23 |
| Less razors sold | 120, 371 | | | |
| Deduct inc., 1917–18–19 | 51, 819 | (Cost) 11, 887. 26 | | |
| | | 68, 552 "27, 966. 43 | | |
| Balance, Jan. 1 1921 | | 106, 673 | , | 34, 796. 54 |

RECAPITULATION

| | |
|---|---|
| Increase, 1917 | $3, 613. 43 |
| Increase, 1918 | 4, 470. 08 |
| Increase, 1919 | 2, 928. 75 |
| Increase, 1920 | 22, 909. 28 |
| Total increase | 33, 921. 54 |

The taxpayer and the examining agent agreed that at the close of each year a certain number of the razors then out on consignment would be paid for, this being estimated by the examining agent at the number shipped in the 60 days preceding the close of the year and not paid for by the close. He computed accounts receivable based on such statements in the last 60 days on the basis of the shipments for the year or where cards were available on the basis of the actual shipments during the period, multiplying the number arrived at in this manner by the average selling price for the year. The Commissioner determined that this particular computation was erroneous in that the razors were shipped on consignment and therefore still belonged to the taxpayer. He therefore added to the inventory the estimated number of razors represented by the revenue agent's computation of accounts receivable, but included these razors at the inventory or cost price instead of the sales price.

The taxpayer had on deposit with the Torrey Razor Company at the close of the years 1918, 1919, and 1920, sums of money amounting to $318.44, $175.49, and $83.86, respectively, deposited as advance payments on razors thereafter to be purchased and delivered, and not representing cost of goods sold during each of those several years, either under the cash receipts and disbursements or the accrual method of accounting for and reporting net income. The taxpayer had also on deposit with Berk Bros., the sum of $4,160 under similar circumstances at the close of the year 1918, which sum was used for purchases in the year 1919.

The taxpayer in the year 1919 operated a branch office under the name of the Gullatt Razor Co. at Atlanta, Ga., the sales and expenses of which branch office were not included in its original return. Sales of $3,364.54 and expenses of $2,628.68 were respectively income and expense for that year.

The Commissioner adjusted the depreciation account for the years 1917, 1919, and 1920, by allowing depreciation in excess of that claimed for the years 1917 and 1920 in the sums of $235.15 and $82.58, respectively, and disallowing excessive depreciation in the year 1919, in the sum of $58.15, which adjustments are not in dispute between the parties.

The taxpayer in the year 1919 charged to expense items of replacements which should have been capitalized in the sum of $1,006.03, and failed to report a profit on sales of capital assets in the sum of $181.37. The Commissioner has made such adjustments and they are not disputed by the taxpayer.

The taxpayer did not report in 1920 cash commission earned in the sum of $172.07, and this was added to the income by the Commissioner and is not disputed.

During the year 1919 the president of the taxpayer, C. H. Gullatt, withdrew from the corporation the sum of $5,347.98, to be used in acquiring oil lands in Tennessee. The evidence does not clearly disclose whether there was substituted for the sum so withdrawn a note of C. H. Gullatt or whether the sum so withdrawn was invested by C. H. Gullatt on behalf of the corporation.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final decision will be settled on consent or on ten days' notice in accordance with Rule 50.

### OPINION.

JAMES: The taxpayer alleged the following errors as the basis of its appeal:

1. That the Commissioner erroneously substituted arbitrary inventories in the computation of the taxpayer's income for each of the several years in place of the cash receipts and disbursements basis used by the taxpayer.

2. That the invested capital of the taxpayer was erroneously reduced on account of patents and good will paid in for stock.

3. That the invested capital of the taxpayer was erroneously reduced as to the years 1919 and 1920 by the deduction as to those years of the sum of $5,347.98 withdrawn by C. H. Gullatt.

In addition, the taxpayer in its evidence and brief has alleged further errors with respect to the several advances to the Torrey Razor Company, with respect to certain alleged automobile expenses claimed as deductions, and with respect to the omission from invested capital of a certain alleged payment to the corporation by Mrs. P. A. Gullatt in 1915, in the sum of $4,300.

The taxpayer not having set forth the three last named errors either in the enumeration of errors from which it took the appeal or in the facts set forth in its petition, and not having amended its petition or offered to do so, such alleged errors will not be considered in connection with this decision. The Board is, moreover, justified in its adherence to the pleadings by the failure of the evidence presented to convince the Board that the Commissioner erred in any of these points.

Upon the second point above, the evidence and testimony relate solely to expenditures of the partnership which preceded the corporation. There is no evidence in the record either· as to the value of patents and good will at the date of organization of the corporation or the amount of stock issued therefor; neither is the report of the examining revenue agent clear on this point. He has merely disallowed an item which had not appeared upon any of the early balance sheets of the corporation, but which did appear in various forms upon balance sheets from 1915 to the date of the beginning of the examination. Under the above stated record the claim of the taxpayer upon the second point for additional invested capital on account of patents and good will paid in for stock must be denied.

The taxpayer further claims that the Commissioner erred in deducting from invested capital as to the years 1919 and 1920 a certain sum withdrawn by C. H. Gullatt and by him invested in leases on oil lands in the State of Tennessee.

The testimony on this point given by Gullatt at the hearing is voluminous, but very far from clear. At one point he testified that he withdrew the money and gave his note to the corporation, and that the funds so withdrawn were loaned to him by the corporation. At another point he testified that he withdrew the money, giving his note for it, but " I really used it for the corporation in Tennessee." He further testified, "I gave my personal note for it, and later when the transaction in Tennessee was actually wound up, I transferred to the corporation all the holdings in Tennessee that was covered by the various amounts that I borrowed from the corporation."

It appears from the testimony that a corporation was organized in 1919 to take title to the oil leases in question and that Gullatt transferred all of his interest in such leases, purchased with the money withdrawn from the Dixie Manufacturing Company, for 333,000 shares of the stock of the oil company, of a par value of $1. This transfer occurred in 1919. It further appears that by 1921 Gullatt had withdrawn a total of approximately $17,000 from the taxpayer corporation on account of these oil operations, and in 1921 transferred the 333,000 shares of stock above mentioned to the corporation, whereupon the book charge against his account was cancelled.

Three possible alternatives as to tax liability are presented by the above record. If Gullatt was really acting for the taxpayer corporation and not on his own account, the exchange of the oil leases for stock in the oil company in 1919 produced a closed transaction subject to consideration in connection with the taxpayer corporation's income and profits tax return for that year. There is no evidence in the record as to the value of the stock received by Gullatt in 1919.

If Gullatt was operating on his own account, the exchange of oil leases taken in his name and for his own account for stock in the oil company in that year, would give rise to taxable income or deductible loss to him personally, depending upon the value of the stock received in exchange in 1919.

If Gullatt was operating upon his own account and, after completing the transaction set forth above, transferred the stock to the taxpayer corporation in liquidation of his indebtedness in 1921, that transaction gave rise to gain or loss on the part of both Gullatt and the taxpayer corporation if the property (the oil stock) received by the taxpayer corporation in 1921 had a readily realizable market value.

Upon the evidence presented by the entire record, any of the above three situations is possible. It is clear that, in any event, the amount withdrawn by Gullatt was not withdrawn from the assets of the corporation, and should not be treated as a deduction from invested capital. Presumably, it was so treated by the examining agent upon the theory that the cash so withdrawn represented a dividend distribution. On this point he, however, submits no evidence, and there is no evidence on the record before the Board. In these circumstances, the taxpayer's invested capital for the years 1919 and 1920, should not be decreased by the above mentioned sum of $5,347.98. Whether its taxable income should be increased, either in the year 1919 or 1921, the Board does not decide. If the Commissioner concludes that further examination should be made into this transaction and tax liability asserted either against the corporation or C. H. Gullatt, or both, the way is open to him to do so.

The main point of the taxpayer's appeal rests upon the proposition that it should not be charged with a theoretical inventory upon the basis computed by the examining agent as of the close of each of the years 1917 to 1920, inclusive.

We have already set out the detailed inventories as worked out by the examiner. The agent was called as a witness by the taxpayer and was subjected to thorough examination by both the taxpayer's and the Commissioner's counsel. C. H. Gullatt, president of the taxpayer, also testified. At many points the testimony of the agent and of Gullatt was in sharp conflict.

An examination of the table showing the inventory computations made by the examining auditor is a conclusive demonstration of the danger of attempting to supply accounting facts from hypothetical computations. The accuracy of the examiner's inventory computations rests entirely upon an assumed ratio of gross sales and paid sales, constant for all years, an assumed ratio of returned razors to razors sent out, and an assumed ratio of razors returned in a damaged condition to total razors returned. The examining agent made a thorough, painstaking, and intelligent use of the material at hand and available for the theoretical construction of inventories on the basis he sought to use, but the results he secured completely refute themselves. From an inventory of $875 at the close of 1916, representing on the basis of average prices about 2,500 razors, the agent's computations of inventories rise until, on December 31, 1920, he has a closing inventory of 106,673 razors and a value of $34,796.54, this on sales which in the highest year totaled only 120,371 razors.

It is inconceivable that the taxpayer would continue to order and pay for razors for use in its business if it had on hand usable or salable razors in the quantity set forth in the inventory presented by the examiner.

Nor are we convinced that the use of inventories in the taxpayer's case would result in more clearly reflecting the income· than that income is reflected without the use of inventories. The undisputed testimony shows that large quantities of razors sent out are never heard from again, although such razors are sent out on consignment and title remains with the taxpayer in theory until they are paid for or returned. It further appears from the undisputed testimony that of the razors returned, at least a very substantial quantity are in such condition as to be useless for resale. The taxpayer bought razors for cash and sold for cash. It sold on a ten-day free-trial-offer plan. It seems reasonable to believe, therefore, that the taxpayer's cash receipts and cash disbursements measured with reasonable accuracy its income year after year. If there was any substantial difference between purchases of razors and shipments of razors, so that a substantial quantity of any razors remained in inventory at the close of any year, that fact would be reflected in the succeeding year. From all the evidence, however, it appears very doubtful if such was the case.

It is, therefore, the opinion of the Board that the examining agent's opening invested capital for the year 1917 has not been shown to be erroneous, and must therefore be presumed to be correct, and that his further adjustment for the year 1919 has been shown to be erroneous and should not be adopted. It is further the opinion of the Board that taxable income should be adjusted as follows:

### 1917.

From the income reported by the taxpayer of $115.54 should be deducted depreciation in the sum of $235.15, making a net loss for the year of $119.61.

### 1918.

To the net income reported by the taxpayer of $5,841.82 should be added advances to the Torrey Razor Co., $318.44, capital expenditures improperly deducted as expense, $1,006.03, profit on sale of capital assests, $181.37, and advances to Berk Bros., $4,160.00, making a corrected net income of $11,507.66.

### 1919.

To the income reported by the taxpayer on its return of $9,188.03 should be added advances to the Torrey Razor Co., $175.49, excessive depreciation, $58.15, and sales not reported, $3,364.54, total additions of $3,598.18, and from the above should be deducted the purchases from Berk Bros. of $4,160.00, and expenses of the Atlanta branch office, $2,628.68, total deductions of $6,788.68, making corrected net income of $5,797.53.

1920.

To the income reported by the taxpayer of $2,688.76 should be added cash commissions, $172.70, and advances to the Torrey Razor Co., $83.86, from which should be deducted additional depreciation of $82.58, making the corrected net income $2,864.24.

The final determination of the Board on the basis of the foregoing with appropriate adjustments of invested capital from year to year will be settled upon notice as set forth in the decision.