Walter E. Kramer, Executor, Estate of Julius Kramer, Deceased, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Olga R. Kramer, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Jacob L. Schnadig, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 47247, 47329, 58943, 59191, 62842, 62843.
Promulgated April 3, 1933.

*Paysoff Tinkoff, Esq.*, for the petitioners.
*Chester A. Gwinn, Esq.*, for the respondent.

OPINION.

Trammell: These are consolidated proceedings for the redetermination of deficiencies in income tax as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Julius Kramer | 47329 | 1924 | $5,685.22 |
| | | 1925 | 634.88 |
| | | 1926 | 29,370.46 |
| | 59191 | 1928 | 18,943.45 |
| | 62842 | 1929 | 1,010.29 |
| Olga R. Kramer | 62843 | 1929 | 131.87 |
| Jacob L. Schnadig | 47247 | 1924 | 2,473.00 |
| | 58943 | 1928 | 6,038.25 |

The petitioner, Olga R. Kramer, agreed at the hearing that the deficiency determined against her by the respondent in Docket No. 62843 is correct, and that judgment may be entered accordingly.

At the hearing, counsel for the petitioners suggested the death of the petitioner, Julius Kramer, and moved that Walter E. Kramer, executor of the estate of said decedent, be substituted as petitioner, which motion was granted.

The issues submitted for decision are: (1) Whether or not the petitioners are entitled to deductions for exhaustion of alleged contractual rights to receive royalties from patents pooled under the terms of a certain contract dated November 3, 1916; (2) whether or not the petitioners are entitled to deduct from income for 1924 certain amounts refunded in that year to a corporation of which Julius Kramer and Schnadig were the sole directors and which amounts represented dividends unlawfully paid out of the corporation's capital; (3) whether or not amounts distributed to Julius Kramer and Schnadig in 1924 and 1925 from reserved royalties should be included in income for said years; (4) whether or not the petitioners are entitled to deduct from income for 1924 amounts paid to repurchase stock from a former manager of a corporation of which said Kramer and Schnadig were directors; (5) whether or not the estate of Julius Kramer is entitled to deduct from income of said decedent for the years 1924, 1925 and 1926 amounts paid by said decedent to his son Walter E. Kramer for services rendered by the son during said years to a corporation whose stock was then owned by Julius Kramer and Schnadig; (6) whether or not the sale by Julius Kramer in 1926 of his two-thirds undivided interest in certain real estate was an installment sale within the meaning of section 212 (d) of the Revenue Act of 1926; and (7) whether or not the petitioners are entitled to deduct from income for 1928 any amounts as representing losses on the sale in said year of the capital stock of the Davoplane Bed Company.

The first issue for consideration here is whether or not the petitioners are entitled to deductions for exhaustion of alleged contractual rights to receive royalties under a certain pooling contract dated November 3, 1916. The petitioners claim that said rights were acquired on December 16, 1916, under the following circumstances:

In November, 1906, Julius Kramer and Schnadig purchased stock in the Pullman Couch Company, a corporation organized in January, 1906, which was engaged in manufacturing couches and Turkish rockers. In 1907, the Pullman Couch Company acquired for $2,500 cash certain patents, known as the "Bostrom patents," covering davenport beds of folding steel construction inside of a wooden frame. These patents proved to be very valuable. ·

In January 1910, a corporation known as the Davoplane Bed Company was organized for the purpose of holding the Bostrom patents, and its stock was issued one-third to one Kroehler and two-thirds to Julius Kramer and Schnadig. Just prior to that time Julius Kramer appears to have been the sole owner of the three Bostrom patents, and that he paid said patents in to the Davoplane Bed Company in exchange for 1,498 shares of its capital stock out

of a total of 1,500 shares, one-third of which stock was then transferred to Kroehler for 10 shares of stock which he held in the Pulman Couch Company. It is not shown when or in what manner Julius Kramer acquired the Bostrom patents from the Pullman Couch Company prior to the organization of the Davoplane Bed Company in January, 1910, except that he acquired said patents " as trustee " for the purpose of forming the Davoplane Bed Company.

Infringement litigation was instituted by the Davoplane Bed Company for the purpose of establishing the validity of its Bostrom patents, which litigation was terminated in favor of said company by a decision of the United States Circuit Court of Appeals for the Seventh Circuit on April 18, 1916. *Freedman* v. *Davoplane Bed Co.*, 234 Fed. 70.

As a result of the establishment of the validity of the Bostrom patents, a pool was formed in November 1916, of numerous patents, including the Bostrom patents, relating to the construction of folding davenport beds and similar devices. On November 3, 1916, a written agreement was entered into between the owners of the various patents mentioned, which provided for the granting of an exclusive license to the Seng Company (which had formerly held a license from the Pullman Couch Company under the Bostrom patents) to manufacture and sell under all of said pooled patents, the specified royalties to be divided in stated proportions among the parties to said agreement. Of the total amount of said royalties, 33 per cent was allotted to the Pullman Couch Company as the share of the Kramer-Schnadig group. The pooling contract also provided that each party or group should have a free shop right or license, and pursuant to this provision the free shop right to which the Kramer-Schnadig group was entitled was given to the Pullman Couch Company.

On December 16, 1916, a meeting of the directors of the Pullman Couch Company was held, at which a resolution was adopted directing its officers to execute an assignment or order to the Seng Company, the licensee under the pooled patents, directing said licensee to pay to Julius Kramer and Schnadig all royalties due or to become due to the Pullman Couch Company under the pooling agreement. The license contract of November 3, 1916, was signed by the Davoplane Bed Company and also by the Pullman Couch Company, as well as by Julius Kramer and Schnadig, individually. The Pullman Couch Company " submitted " 13 patents to be controlled by the pool agreement, including two of the Bostrom patents, and the Davoplane Bed Company " submitted " 7 patents, including one of the Bostrom patents. Julius Kramer likewise " submitted " one patent.

The foregoing facts, summarized from the evidence adduced by the petitioners, do not disclose the circumstance attending the numerous transfers of the Bostrom patents during the period from 1906 to 1916. Shortly after 1906 it is indicated that said patents had been acquired by Julius Kramer and Schnadig, and transferred to the Pullman Couch Company. In the early part of 1910, it is shown that Julius Kramer was the sole owner of said patents and paid them in to the Davoplane Bed Company in exchange for substantially all of its capital stock. In March 1913, petitioner's counsel states that the Bostrom patents "technically belonged to the Pullman Couch Co." but that Kramer and Schnadig owned all of the stock of that company. On November 3, 1916, we find two of the patents being submitted to the patent pool by the Pullman Couch Company and one of them submitted by the Davoplane Bed Company. The record fails to disclose why the entire 33 per cent of the total royalties accruing to the patent pool should have been assigned to the Pullman Couch Company instead of being divided between that company, the Davoplane Bed Company and Julius Kramer in proportion to the number or value of the patents contributed to the pool by each.

However, it is clearly established that in 1916 said patents were not owned directly either by Julius Kramer or by the petitioner Schnadig. Those individuals owned all the capital stock of the Pullman Couch Company and a majority of the Davoplane Bed Company, which corporations owned all the patents contributed to the pool by the Kramer-Schnadig group except one patent submitted by Julius Kramer.

On December 16, 1916, Julius Kramer and Schnadig, who were the sole stockholders and directors of the Pullman Couch Company, caused that corporation to assign and transfer to them its right to receive the royalties from the patent pool. However, they were already entitled to receive those royalties from the corporation as dividends on their stock. Instead of permitting the corporation to receive the royalties and then pay the same over to them in the form of dividends, they caused the corporation to assign the royalties to them directly. This cutting of corners did not fundamentally change the situation and the amounts which constituted royalty payments to the corporation constituted dividends when assigned to and received by the stockholders. Under these circumstances, the so-called "contractual rights" of the petitioners to receive the corporation's royalties did not, in our opinion, give rise to a capital asset in respect of which amortization or exhaustion deductions are allowable.

The petitioners contend that they are entitled to exhaustion deductions on the basis of the *value* of the alleged contractual rights

at the time of acquisition in 1916, apparently on the theory that the assignment of the corporation's royalties to them constituted a gift. The petitioners offered evidence to establish the *value* at said date as distinguished from *cost*. It is to be observed, however, that the contract which gave rise to the royalty payments to the corporation was not assigned, but only the right to receive the payments under the contract still held by the corporation. There is no evidence that the *corpus* or *res* which gave rise to the right of the corporation to the royalties was assigned to the stockholders. The corporation merely directed that the royalties which it was entitled to receive be paid directly to its stockholders.

We are unable to distinguish this situation in principle from the principle set forth in the line of decisions of which a typical example is *Rensselaer & Saratoga R. R. Co.* v. *Irwin*, 249 Fed. 726 (certiorari denied, 246 U. S. 671). In that case, the plaintiff railroad company leased its properties to a second company which agreed to pay as rental, among other things, interest upon bonds of the lessor, and to pay directly to the lessor's stockholders amounts equal to dividends upon their stock at the rate of 8 per cent per annum. The court held that the amounts so paid directly to the lessor's stockholders as rental must be treated as corporate income of the lessor subject to taxation, and that as between the lessor and the stockholders these amounts constituted dividends. The court further pointed out that the provision for payment directly by the lessee was a mere labor-saving device. See also *United States* v. *Western Union Telegraph Co.*, 19 Fed. (2d) 157, and other decisions therein cited to the same effect.

In the instant case, the resolution of the directors under which the corporation's royalties were paid directly to its stockholders instead of through the corporation would not have the effect of changing the rights of the stockholders. Before the resolution was adopted, the stockholders had the right to receive as dividends the royalty payments to the corporation. After the resolution the stockholders in legal effect were in no different position, under the above cited decisions. What the stockholders received were still dividends. The right to receive dividends does not constitute a capital asset which may be made the subject of amortization deductions.

Another contention of the petitioners is that the right to receive the royalties was given by the corporation to its stockholders for prior services and for certain patent rights yielded up to the corporation; that under these circumstances the right to receive the royalties became a valuable property right which is subject to amortization allowances. But even considering without deciding that the right to receive the royalties to which the corporation was.

entitled constituted "property," it was acquired after March 1, 1913, and in respect to property so acquired the basis for exhaustion allowances is cost. Section 204 (c) of the Revenue Acts of 1924 and 1926. And there is in the present record no evidence of the cost of such "property." The cost of property is what is given for it. In this case what is claimed to have been given for the alleged contractual rights were services and patent rights, but the evidence does not establish the value of either. The contentions of the petitioners can not be sustained, and the action of the respondent on this issue is approved. *National Film Publicity Co.*, 4 B. T. A. 118; *A. C. F. Gasoline Co.*, 6 B. T. A. 1337.

The second issue is whether or not the petitioners are entitled to deduct from income for 1924 certain amounts refunded in that year to a corporation, in the following circumstances: Julius Kramer and Schnadig were stockholders and directors of the Chicago Mail Order Company from 1916 to 1925. Prior to 1924 the board of directors of that company authorized the distribution to stockholders of dividends out of the corporation's capital. On being advised by counsel that such distributions were illegal and that the directors were personally liable on that account, both civilly and criminally, Kramer and Schnadig repaid to the corporation in 1924 the amounts of such dividends received by them and the members of their families. The amount so refunded by Julius Kramer in 1924 was $41,036.24. The amount so refunded by Schnadig in 1924 was $45,353.53.

The petitioners claim that these refunds are deductible from income for 1924 as losses sustained in that year. The respondent contends that the amounts constituted contributions to the capital of the corporation, and therefore are not deductible as losses in the year in which paid. We have consistently held in a long line of decisions that assessments levied upon stockholders on account of the impairment of a corporation's capital represent additional investments in the capital stock and are not deductible as losses. See the following cases and decisions therein cited: *W. R. Ranney*, 16 B. T. A. 1399; affd., 46 Fed. (2d) 283; *B. Estes Vaughn*, 17 B. T. A. 620.

We can see no good reason why the rule announced in the cited cases should not be applicable here. It is not controlling, we think, that in the instant case the capital of the corporation was impaired through mistake or ignorance of its directors and that they may or may not have been criminally liable for such acts. When the dividends were declared and paid out of capital, the capital of the corporation was impaired, and the value of the stock owned by the petitioners was lessened; when the funds were repaid to the corporation in 1924, the impairment and value of the capital stock were to that extent restored. The investment of the petitioners in the

capital stock was increased by these amounts. The action of the respondent in disallowing the deductions claimed is approved.

The third issue raised the question whether or not the amounts of $2,310 and $2,714.54 received by Julius Kramer in the years 1924 and 1925, respectively, and the amount of $2,310 received by Schnadig in 1924, from reserved royalties in the hands of the licensee under the pooling contract of November 3, 1916, constituted taxable income. The correctness of the respondent's action in including these items in income was conceded by the petitioners in their reply brief filed herein on January 3, 1933. Respondent's action on this point is, therefore, approved.

Issue (4) involves the question whether or not petitioners may deduct from income for 1924 amounts paid by Julius Kramer and Schnadig in connection with the repurchase of stock of the Chicago Mail Order Company from a former manager of that company.

The record shows that prior to 1924, one Benjamin Strauss was employed as manager of the Chicago Mail Order Company, and that his services proved to be unsatisfactory. At the time of his employment Strauss purchased from the corporation some stock then held in its treasury, and in order to terminate his connection with the corporation, his stock was repurchased by the corporation in 1924 and returned to its treasury. Julius Kramer and Schnadig each paid to the corporation in 1924 the amount of $5,147.97 to cover the alleged loss sustained by the corporation in that transaction.

The petitioners assert that these expenditures were made by the stockholders to protect their business interests and are deductible from 1924 income as business expenses. The respondent urges that the expenditures were in the nature of capital investments in the stock of the company, and are not allowable as deductions.

We have held that where a taxpayer makes an expenditure to promote or to protect his business, which is directly connected with or proximately results from his business, and no capital asset is acquired thereby, such expenditure is deductible as a business expense. See *A. King Aitkin*, 12 B. T. A. 692; also *Louisiana Jockey Club, Inc.*, 13 B. T. A. 752, and *Edward A. Pierce*, 18 B. T. A. 447.

The principle applied in those cases, however, is not, we think, applicable here on the facts. It does not appear in the instant case that the expenditures in question were made either to promote or to protect the business interests of the stockholders. It is not clear that the corporation sustained any loss in connection with the transaction in question. If it did sustain such loss, it was prior to 1924 when it sold the treasury stock to Strauss, and the amount probably was not the same as the alleged loss for which the corporation was

reimbursed in 1924 by Kramer and Schnadig. The corporation suffered no loss by the act of repurchasing its stock from Strauss, even though the price at which the stock was so repurchased was in excess of the price at which it was sold. Whether or not the corporation ultimately would sustain a loss or derive a profit on the stock repurchased could not be determined until the stock was finally sold again and a completed transaction effected. Apparently Kramer and Schnadig considered that the corporation had sustained a loss by reason of the fact that it repurchased its stock at a greater price than that at which it was originally sold to Strauss. On this point Schnadig testified as follows:

A. Well, we hired a very good man by the name of Benjamin Strauss, and in order to obtain his services, we sold him some stock at a certain figure. The high-grade gentleman did not turn out so wonderful as he was supposed to be. In order to let him go, and clean up the indebtedness that he had against the corporation, and the stock had shrunk to a certain extent, and the directors having made the arrangement, we felt it was our duty under those circumstances—this stock had been taken out of the treasury stock, and it would go back into the treasury stock at a loss, and again we were told we did not do the proper thing, so we put the stock back, and put the difference in money back.

Obviously it was not necessary for Julius Kramer and Schnadig to reimburse the corporation for its supposed loss in order to protect their business interests. Whatever menace, if any, Strauss may have been to the business, his connection with the corporation had been severed when his stock was repurchased by the corporation, and the subsequent payments made by Kramer and Schnadig to the corporation representing the difference between the original sale price and the repurchase price of the stock can not be regarded as having been made by them to protect their interests in the corporation against injury by Strauss. It is unnecessary for us to determine here whether the payments constituted gifts to the corporation, or represented additional investments in its capital stock. In the circumstances shown, we think they are not allowable as deductions from gross income of the petitioners for 1924 as business expenses.

Under issue (5) the estate of Julius Kramer, deceased, seeks to deduct from income for the years 1924, 1925 and 1926 amounts paid in those years by the decedent to his son, Walter E. Kramer, for services rendered to the Pullman Couch Company.

In 1924 Julius Kramer was receiving a salary of $30,000 per year from the Pullman Couch Company, and in December of that year his son, Walter E. Kramer, was employed by that company. The son rendered services to the company during the month of December 1924, and during the years 1925 and 1926. He was paid a salary of

$125 per month, and gave his entire time to the company. His salary was paid by his father, Julius Kramer.

The petitioners contend that the amounts so paid are deductible from the income of Julius Kramer as business expenses on the principle discussed under the preceding issue, that is to say, that Julius Kramer was moved to pay his son's salary in order to promote or to protect his own business interests. The respondent takes the position that the amounts in question represent gifts from the father to the son, and are not deductible.

Again, we think, the contention of the petitioners must be denied on the facts. Not only does the record fail to disclose that the payments were made by Julius Kramer to promote or to protect his business interests, but quite the contrary is indicated by the following testimony of the witness Schnadig:

A. * * * Mr. Kramer and myself had been drawing the same amount of pay all the time that we had been together. We practically drew the same amount in salary out of those firms. Walter Kramer got out of school, and he had been there, he had been working a very short time and his services were not so valuable as he thought they were, and Mr. Walter Kramer promptly got married, and he needed more money. And we discussed it, and Mr. Kramer says, " Well, I don't think it is fair to give him money he is not entitled to." He says, " But he is going to work for the Pullman Coach Company as hard as he can," and he says, " Instead of giving it to him from the firm," he says, " I will take part of my salary off, and you pay it to him." That was about the substance of it.

In the absence of evidence reasonably tending to show that the amounts claimed as deductions were in fact business expenses incurred and paid as such by Julius Kramer, the respondent's action on this issue is approved.

Issue (6) presents the question whether or not the sale by Julius Kramer in 1926 of his two-thirds undivided interest in certain real estate was an installment sale within the meaning of section 212 (d) of the Revenue Act of 1926, which provides that a taxpayer may return as income in any taxable year from a sale of real estate, where the initial payments do not exceed one-fourth of the purchase price, that proportion of the installment payments actually received in that year which the total profit realized, or to be realized when the payment is completed, bears to the total contract price.

In March 1916, Julius Kramer and Schnadig purchased a piece of real estate located at 63d Street and Ashland Avenue, in the city of Chicago, for $139,290.07. Julius Kramer took title to the property, and in November 1916, deeded an undivided one-third interest therein to Schnadig. In 1926 said Kramer and Schnadig sold the property by one contract of sale to a single purchaser for the total consideration of $450,000, of which $200,000 was paid in cash and the

balance in deferred payments evidenced by mortgage notes in the amount of $250,000. The net profit realized by Kramer and Schnadig on the sale of this real estate amounted to $298,621.42, two-thirds of which is applicable to Julius Kramer and one-third to Schnadig.

The contract for the sale of the real estate in question was executed under date of August 24, 1926. Prior thereto (on August 15, 1926), Julius Kramer and Schnadig executed a written agreement in which it was recited, among other things, that an offer had been received from one Mecklenburg (who subsequently executed the contract of October 24, 1926) to purchase this property in its entirety for the total consideration of $450,000, of which $200,000 was proposed to be paid in cash and a mortgage given for $250,000, title to the whole property to be conveyed in one deed; and further that Schnadig " was anxious to accept this offer, as this would relieve his financial embarrassment." In this situation and because of other matters referred to therein, Julius Kramer consented to accept the offer for his two-thirds undivided interest in the property on the express understanding that the sale should be regarded as a separate sale by each party of his respective undivided interest; that of the total consideration to be paid, Kramer should receive $300,000 as follows: $50,000 cash and "a $250,000.00 note, Secured by a Mortgage on said Property," and that Schnadig should receive for his undivided one-third interest $150,000 in cash.

There is no controversy between the parties respecting the proportions in which the total profit derived should be allocated to Kramer and Schnadig. In fact, the respondent concedes, and so stipulated at the hearing, that two-thirds of the total profit is applicable to Julius Kramer and one-third to Schnadig. The sole question is whether or not the sale by Kramer of his two-thirds undivided interest was an installment sale within the purview of the statute.

At the time of the sale the real estate in question was held by Julius Kramer and Schnadig in joint possession by several and distinct titles. The only unity was that of possession. This constituted them tenants in common. *Stookey* v. *Carter*, 92 Ill. 129; *Harvey* v. *Cherry*, 76 N. Y. 436; *Jones* v. *Cohen*, 82 N. C. 75; *Hunter* v. *State*, 60 Ark. 312; 30 S. W. 42; *Ada R. Giles*, 1 B. T. A. 1066.

Each party sold his undivided interest in the real estate, which was what he owned and held title to. The two undivided interests constituting the whole fee were sold for a lump sum or total undivided consideration of $450,000, consisting of $200,000 cash and a mortgage for $250,000. Mecklenburg did not agree in the contract of purchase and sale to buy Julius Kramer's undivided two-thirds

interest for a certain consideration and Schnadig's undivided one-third interest for a different consideration. The contract provided for the purchase by Mecklenburg and the sale by Julius Kramer and Schnadig of the whole fee for a specified total consideration. When the sale was consummated and the total purchase price paid over in accordance with the terms of the contract, two-thirds of the proceeds of the sale belonged to Julius Kramer and one-third to Schnadig.

The interest of each party in the total proceeds of sale was the same as their respective interests in the real estate sold. Two-thirds of the cash payment of $200,000 and a two-thirds interest in the mortgage note of $250,000 belonged to Julius Kramer, and a one-third interest belonged to Schnadig. It is immaterial that they had agreed beforehand to apportion the proceeds of sale between them in different proportions. Their agreement of August 15, 1926, concerning the amount of cash to be taken by each obviously did not attach until the proceeds of sale had been received from Mecklenburg, and at the instant of receipt their respective interests therein were the same as they had been in the real estate. The effect of the agreement was merely to provide that Schnadig should have the right to exchange his interest in the mortgage note for a part of Kramer's cash, or that Kramer should purchase Schnadig's interest in the note for an equivalent amount of cash.

If the parties had exchanged their real estate for other real property instead of cash and notes, their respective interests in the property acquired would have been the same as in the property exchanged, even if they had previously agreed that immediately upon the acquisition of the new property it would thereupon be divided among them or that one would take the whole property and compensate the other for his interest therein.

If Mecklenburg had agreed in the contract of purchase and sale to give Julius Kramer $50,000 cash and a mortgage note for $250,000 for his undivided two-thirds interest in the real estate, a wholly different situation would be presented, but, as above pointed out, this was not done.

Under the facts disclosed here, we must hold that the initial payment made by Mecklenburg to Julius Kramer for his undivided two-thirds interest exceeded one-fourth of the purchase price, and that the transaction was not an installment sale within the meaning of the statute. The respondent's action on this issue is approved.

The seventh and last issue is whether or not the petitioners are entitled to deduct from gross income for 1928 amounts representing losses on the sale in that year of stock in the Davoplane Bed Company. Julius Kramer and Schnadig each sold stock of the company

in that year to Walter E. Kramer for $25. The number of shares of stock so sold by Julius Kramer was 200. The number of shares sold by Schnadig is not definitely shown, although each apparently sold the same number, since the loss of each is claimed to be the same. Petitioners contend that the stock had a fair value at March 1, 1913, of $36,000 or $180 per share, and that, when it was sold in 1928 for $25, each of the parties sustained a deductible loss in the amount of $35,975.

The evidence on this point is incomplete, indefinite and in some particulars contradictory. It is shown that Julius Kramer acquired all the stock of the Davoplane Bed Company, except two qualifying shares, in 1910 in exchange for the Bostrom patents, of which he was then the sole owner according to evidence adduced by the petitioners at the hearing. It is further shown that the stock was divided between Kroehler, Kramer and Schnadig, apparently one-third to each, and that in 1928 Julius Kramer and Schnadig each sold 200 shares to Walter E. Kramer for $25.

The Davoplane Bed Company acquired the Bostrom patents in 1910 in exchange for its capital stock having a par value of $15,000, and Schnadig testified that said company had no other asset. No money was paid in to the company at the time of organization. Schnadig also testified that the Davoplane Bed Company still retains title to the Bostrom patents and improvement patents thereon; yet two of the three Bostrom patents were "submitted" to the patent pool in 1916 by the Pullman Couch Company, and all royalties due to the Kramer-Schnadig group (both corporations and individuals) on account of patents contributed to the pool, were assigned to the Pullman Couch Company. The pooling agreement of November 3, 1916, to which the Davoplane Bed Company was a party, discloses that said company "submitted" seven patents, including only one of the Bostrom patents, issued in various years from 1907 to 1915, there being two patents issued in each of the years 1914 and 1915. The patents issued in 1914 and 1915 had not expired in 1928, but whether the Davoplane Bed Company owned those patents, or any of them, in 1928 is not definitely shown.

The last Bostrom patent expired in 1924, and apparently thereafter the Davoplane Bed Company had no asset of any kind. If it did have any asset after that year, neither the nature of such asset nor its value is established by the record. It is clearly shown, however, that the Davoplane Bed Company did not engage in active operations after November 3, 1916; that about that time it assigned its right to receive royalties under the patents owned by it, and never thereafter received any income. In the light of these facts, it would appear very doubtful whether the stock of the Davoplane Bed Com-

pany had any value in 1928.  Certainly we can not affirmatively say from the evidence that this stock did have any value in that year.

The respondent disallowed the deductions claimed under this issue on the ground that the stock of the Davoplane Bed Company became worthless in 1924, and hence that no value remained to be lost on the sale of the stock in 1928.  In our opinion, the petitioners have not met the burden of proving by a preponderance of the evidence that his determination was erroneous.  Respondent's action, is, therefore, approved.

> *In Docket No. 62843 judgment will be entered for the respondent.  In Docket Nos. 47247, 47329, 58943, 59191 and 62842 judgments will be entered under Rule 50.*