*Decisions will be entered under Rule 50.*

G. LOUTRELL TIMANUS AND HELEN TIMANUS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66533.    Filed June 12, 1959.

*D. Sylvan Friedman, Esq.,* and *Joshua W. Miles, Esq.,* for the petitioners.

*William Schwerdtfeger, Esq.,* for the respondent.

638

OPINION.

HARRON, *Judge:*

*Issue 1.*

Petitioner's computation of annual depreciation of three properties in Baltimore in the amount of $880 has been made on the basis of assigning a value of $44,000 to the three properties as a unit. His explanation is that after his father died, he and his mother determined the above value. The time of the father's death was in 1920. Petitioner takes the position that his adjusted basis at the end of 1949 for all of the properties is to be determined with reference to $44,000 as the fair market value of the properties at the time of his father's death. He has assumed a useful life for 50 years for the buildings from the time of his father's death, or a rate of depreciation of 2 per cent.

Respondent does not question the rate of depreciation, but he contends that petitioner errs in the assumption that the basis to himself of each property is the same. We agree with that contention. Respondent contends, also, that petitioner has failed to establish by competent proof the amount of his adjusted basis for each property. With that we also agree.

Petitioner has not cited any authority for his position.

With respect to proving the value of each piece for the purpose of arriving at his basis, petitioner relies solely upon his own testimony that he and his mother assigned a value of $44,000 to the three properties at the time of his father's death. Respondent, on the other hand, has introduced evidence about the value of one property at the time of the death of petitioner's mother and such evidence can be considered with reference to the value at the critical date of the other properties. Respondent's evidence was not rebutted. Under the circumstances of this case, little weight can be given to the opinion of value of the petitioner and his mother (as the owners of the property), although under different conditions an owner's opinion of value can be given considerable weight.

The three properties on Maryland Avenue were owned by petitioner's father. Upon the death of the father, 1309 and 1311 passed to petitioner and his mother as joint tenants with a right of survivorship. The basis of these properties was their fair market value at the time of the father's death in 1920 under section 113(a)(5) of the

1939 Code.[1] That basis (whatever the amount was), adjusted for annual depreciation from the time of the father's death, was the basis of the two properties to petitioner as the survivor of the joint tenants, under section .113(a), because the property did not acquire a new basis in 1934 upon the death of petitioner's mother. Under the 1939 Code, the basis of property to the survivor of joint tenants is the "cost" basis thereof under section 113(a), since nothing passes to the survivor of joint tenants by bequest, devise, or inheritance, and upon the death of one of the joint tenants, the property does not acquire a new basis under section 113(a)(5). 3A Mertens, Law of Federal Income Taxation, par. 21.81 (1958 rev.); I.T. 3743, 1945 C.B. 143; G.C.M. 6677, VIII-2 C.B. 172, 178; *Helen G. Carpenter*, 27 B.T.A. 282; *Edward W. Schiesser*, 28 B.T.A. 640.

With respect to the other property, 1307, it acquired a new basis upon the death of petitioner's mother in 1934 under section 113(a)(5) because it passed to petitioner under his mother's will.

Under the circumstances described above, the basis of 1309 and 1311 had depreciated annually from the time of the death of petitioner's father, who predeceased his mother, whereas, the basis of 1307 had depreciated from the time of the death of petitioner's mother in 1934. Petitioner was in error in assigning the same basis to 1307 as he assigned to 1309 and 1311.

Respondent produced evidence showing that 1307 was appraised for the purpose of determining the value of the estate of petitioner's mother for Maryland inheritance tax, and that the appraised value in 1934 of that property was $3,000. Petitioner did not offer any evidence to rebut respondent's proof. It is found, therefore, that the basis to petitioner of 1307 is $3,000, less annual depreciation.

The improvements on the three adjoining properties are similar, and they are about the same age. Absent competent proof to the contrary, it is reasonable to assume that the fair market value at the time of the death of petitioner's father of 1309 and 1311 was not greatly in excess of $3,000, each, or $6,000, which basis must be adjusted for annual depreciation from the death of petitioner's father. It is concluded that the basis to petitioner of 1309 and 1311 is $6,000, less annual depreciation.

Whether petitioner is entitled to a deduction in any amount for 1950 and 1951 for annual depreciation of each property depends upon not only the correct basis to petitioner of each property at the time title thereto vested in him, but also whether he had recovered his

---

[1] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(5) PROPERTY TRANSMITTED AT DEATH.—If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. &ast; &ast; &ast;

basis of each property before 1950 through annual depreciation deductions. In his returns for 1950 and 1951, petitioner assigned a basis of $44,000 to the three properties as a unit, and computed the annual depreciation to be $880. Absent proof to the contrary, it is reasonable to assume, and it must be assumed, that for the 15 years 1935 through 1949, petitioner took annual depreciation deductions in the amount of $880, or total depreciation deductions of $13,200. Upon the conclusions reached above relating to the adjusted basis to petitioner of each property, it is clear that the properties were fully depreciated before 1950.

If we were to accept as the fair market value of 1309 and 1311 at the time of the death of petitioner's father in 1920 the value which petitioner says he and his mother adopted at that time, $29,333 (two-thirds of $44,000), such amount would be the basis to petitioner of 1309 and 1311. But the contention that the fair market value of 1309 and 1311 was $29,333 in 1920 is greatly weakened by respondent's evidence that the value of 1307 in 1934 was only $3,000. We think that lacking competent proof through disinterested, expert testimony of the fair market value of 1309 and 1311 in 1920, at the time of the death of petitioner's father, it is not likely that their fair market value then was $29,333.

It is concluded that respondent properly disallowed the annual depreciation deduction for 1950 and 1951 of $880.

*Issue 2.*

Petitioners reported gain from the sale of the Inlet Beach property on the installment basis in their return for 1951. The question for decision is whether the initial payments received by petitioners in 1951 did not exceed 30 per cent of the selling price.[2]

Respondent determined that the gain could not be returned on the installment basis because the selling price of petitioners' interest was $560,000 and the 1951 payments received by them exceeded 30 per cent thereof. The dispute relates to both the amount of the "selling price," which petitioners contend was $600,000, and the total amount of the initial payments received in 1951. Respondent contends on brief that $35,000 should be added to the amount of the initial pay-

---

[2] SEC. 44. INSTALLMENT BASIS.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALITY [PERSONALTY].—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

ments, which is the amount of the Berlinger mortgage which the purchasers assumed and paid in 1951.

There is a further contention of the respondent which is disposed of briefly. On brief, he argues that this issue is not covered by the pleadings. Our conclusion is that the issue is raised by the pleadings. See *Dixie Manufacturing Co.*, 1 B.T.A. 641, 666. The issue was tried; respondent introduced Exhibit Q which relates to this issue; and he examined petitioner about the question. He is not taken by surprise in any way and his contention is without merit.

It is concluded that for the purpose of determining whether petitioners are entitled to the benefit of section 44(b) "the selling price" referred to therein is, under the facts here, $560,000, the amount for which petitioners agreed to sell their entire interest in the Inlet Beach property, as is set forth in the agreement of July 12, 1951; and that under Regs. 111, sec. 29.44–2, $35,000, the sum of the mortgage assumed by the buyers is not to be considered part of "initial payments." The latter point is immaterial because the 1951 initial payments, $174,000, without the $35,000, represented 31 per cent of the selling price, $560,000. Since the initial payments exceeded 30 per cent of the selling price, petitioners are not entitled to report their long-term capital gain on the installment basis. Respondent's determination to that effect is sustained.

The purchasers of the property agreed in the purchase agreement, as amended, to pay petitioners $560,000 for their interest. They paid $55,000 as a downpayment and gave mortgage notes for the balance of $505,000, some of which was paid in 1951 and the rest was to be paid in deferred payments. The purchasers also agreed to pay Ellis $40,000 for his interest in annual installments. Since by the terms of the purchase agreement the purchasers paid petitioners $560,000 for their undivided interest, petitioners are obliged to use that amount as their selling price for the purposes of section 44(b).

This case is distinguishable from *Walter E. Kramer*, 27 B.T.A. 1043, 1051–1053. The facts here present the kind of situation which is referred to at page 1053 of the *Kramer* case where it was indicated that given such facts as are before us, the amounts specified in a purchase contract as the amounts to be paid to owners of undivided interests in realty constitute the selling prices for the respective undivided interests for the purposes of section 44(b).

Petitioners admit in their reply to the respondent's amended answer that their long-term capital gain from the sale of their interest is $274,358.74. That amount is the difference between the selling price of $560,000 and total costs of $255,641.26. The obvious inconsistency of using a selling price of $560,000 for computing capital gain, and claiming $600,000 as the selling price for the purpose of

making the computation under section 44(b) is not explained by petitioners. Their error lies in ignoring the contract provisions whereby the purchasers specified that $40,000 would be paid to Ellis for his interest and $560,000 would be paid to petitioners for their interest. There is no other possible construction of the contract of sale, as amended.

The evidence is clear that Ellis had a 5 per cent interest in the property held by Inlet Beach, Inc., by virtue of his ownership of stock, and Timanus testified that he gave Ellis a 5 per cent interest in the one-third interest purchased by himself from Hall. Timanus testified, also, that when the entire property was sold, $40,000 of the consideration was alloted to Ellis. Moreover, it was agreed in the agreement of July 12, 1951, that Ellis owned $40,000 of the mortgage indebtedness, to be paid to him in installments of $4,000 per year. There is nothing ambiguous about the provisions of the agreement of July 12, 1951. Under the agreement, Ellis was not to receive any part of the $55,000 downpayment. Therefore, he owned $40,000 of the mortgage indebtedness, as is stated in the amendment to the contract of sale.

In *Walter E. Kramer, supra,* it was pointed out that in the contract of sale there involved the purchasers did not agree to pay a specific amount to each individual owner of an undivided interest in realty. In contrast, that is precisely what was done in the contract of sale before us, and, therefore, the *Kramer* case is not controlling.

There is another question under this issue, whether the disposition of the realty involved two steps, each one of which resulted in taxable gain; first, a liquidating distribution in 1951 to its stockholders of the two-thirds interest by Inlet Beach, Inc., resulting in long-term capital gain to petitioners in the amount of $179,358.74, as respondent has determined; and second, a sale in 1951 of the entire realty in which petitioners received a stepped-up basis and realized long-term capital gain of $95,000. The total amount of the long-term capital gain from two steps is $274,358.74, which is the same amount as the capital gain if the transaction is regarded as having been carried out in one step, a sale by Ellis and Timanus and his wife, as the real owners, ignoring the entity and distribution of the Inlet Beach corporation.

Petitioners do not cite any authority in support of their contention that the corporation and the distribution by it of its two-thirds interest should be ignored, and that they and the corporation should be treated as one. Of course, under some circumstances and facts, exceptions are made to the rule (*Estate of L. B. Whitfield,* 14 T.C. 776) that "a corporation may not be disregarded in respect to taxation." Examples of exceptions which have been made are found in *State-Adams Corporation,* 32 T.C. 365; *Bartell Hotel Co.,* 32 T.C.

311; *John A. Mulligan*, 16 T.C. 1489; and *Paymer* v. *Commissioner*, 150 F. 2d 334. But here such exception should not be made. The corporation, Inlet Beach, Inc., had issued and outstanding certificates of stock, all of which Timanus purchased in the first instance. Ellis purchased 5 shares. Helen Timanus later received 14 shares, and Timanus held only 81 shares. The corporation owned only an undivided two-thirds interest in the realty. The respective interests of G. L. Timanus, Helen, and Ellis in the two-thirds interest in the property was determined through the respective stockholding of each. The only way that Ellis became an owner of record of an interest in the two-thirds interest held by the corporation was through the deed of the corporation given in the distribution to the stockholders. Prior to the sale, the corporation received an easement deed, it gave a mortgage to Berlinger, and in these respects, if not in others, it was recognized as the legal owner of part of the property. When purchasers for the entire property were found, they did not desire to purchase stock in Inlet Beach, Inc. The corporation could have given them a deed for its undivided interest, but if that procedure had been followed Ellis would not have had an interest to sell to the purchasers. Also, petitioners and Ellis believed a less complicated transfer would result if the corporation gave them a deed and they gave one deed for the entire realty to the purchasers. Under all of the circumstances of this case, our conclusion is that the corporation and the petitioners cannot be treated as one, and the liquidation distribution by the corporation ignored. *Harry F. Shannon*, 29 T.C. 702, 721.

In view of the holding with respect to the applicability of section 44(b), *supra*, we are unable to see that there is any real difference taxwise whether or not the corporation's deed and distribution to petitioners and Ellis is ignored. However, since respondent has conceded error in his having determined that the corporation made the distribution in 1950 rather than in 1951, and since the rule 50 computation must involve correction of the error, we may not have been fully apprised of the significance of this question, and, therefore, it is held that in 1951, upon the deeding of a two-thirds interest by the corporation to petitioners and Ellis, petitioners realized long-term capital gain of $179,358.74, of which $89,679.37 is to be taken into account.

By amended answer, the respondent concedes that in 1950, Inlet Beach, Inc., did not deliver a deed to petitioners and Ellis; that, therefore, no distribution was made by the corporation, and a long-term capital gain of $179,358.74 was not realized by petitioners in 1950; and that the deficiency determined for 1950 is to be reduced in the Rule 50 computation. In the amended answer, also, respondent has made claim for an increased deficiency for 1951, under section 272(e), which is based upon the allegation that in 1951 the

total amount of the long-term capital gain realized by petitioners upon the sale of the entire Inlet Beach property amounted to $274,-358.72. Capital gain in that amount was realized in 1951, rather than only $95,000, as was originally determined. Effect will be given by the parties under Rule 50 to the increase of the gain in 1951 and the resulting increase in the deficiency.

*Decision will be entered under Rule 50.*